ADM ASSOCIATES, INC., James Kelly,
Michael LaBianca, John R. Doyle,
and John W. Doyle, Plaintiffs,

v.

GREASE 'N GO, INC., Lawrence Meigs,
Norman K. Lewis, Edward R. Rasmus-
sen, and Richard Lindstrom, Defen-
dants.

ADM ASSOCIATES, INC., James Kelly,
Michael LaBianca, John R. Doyle,
and John W. Doyle, Plaintiffs,

v.

GREASE 'N GO INTERNATIONAL, INC.,
a/k/a Channel One, Inc., and Grease 'N
Go Atlantic, Inc., Defendants.

Civ. A. Nos. CV–88–3724 (DGT),
CV–90–2740 (DGT).

United States District Court,
E.D. New York.

Oct. 19, 1995.

James M. Furey, Jr., Elena R. Lanza, Furey, Furey, Lapping DeMaria & Petrozzo, P.C., Hempstead, NY, for Plaintiffs.

1. Discovery has been completed and the facts set forth are undisputed, except where noted.

2. While the addendum to the ADM license agreement is not dated, it appears to have been exe-

Robert R. Sparks, Jr., Herge, Sparks & Christopher, McLean, VA, for Grease 'N Go Atlantic, Inc.

*MEMORANDUM AND ORDER*

TRAGER, District Judge:

In these two actions, which were consolidated on February 27, 1991, defendant Grease 'N Go Atlantic, Inc. ("GNGATL") has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, defendant's motion is granted.

### Background [1]

Grease 'N Go, Inc. ("GNG") was a business which operated a nationwide set of franchises that performed ten minute oil changes. On January 29, 1988, plaintiff, ADM Associates, Inc. ("ADM"), entered into a license agreement with GNG to operate a Grease 'N Go franchise at a possible site in Nassau or Suffolk Counties. Def's. Mem.Supp. at Exh. 4, p. 1. ADM paid a $25,000 franchise fee for the franchise. *Id.* at 4. The basic license agreement required GNG, as franchisor, to provide a formal training program to franchisees, familiarize them with the GNG system, give them advice and assistance with regard to location, promotions, marketing, layout, equipment, construction and operation of the franchise, provide franchisees with a licensed logo, and bring suit against any unauthorized use of the GNG logo or licensed concepts of GNG. *Id.* at 9. ADM was required to get written approval from GNG with regard to the location, building, machines, and uniforms to be used. *Id.* at 8. ADM was also required to have completed construction of its franchise and be open for business within one year, with a provision for construction delays. *Id.* at 8. There was, however, a three page addendum to ADM's license agreement which contained an option for a "Turnkey Building Lease Program" (or "Turnkey Option").[2] *Id.* at 36. This addendum required GNG to construct or acquire a building to be used as a Grease 'N Go lube

cuted on the same day as the basic license agreement because they both contain the same signatures and have the same attesting witness.

center and offer it to ADM for lease. *Id.* at 36. The addendum states that ADM would have the option to enter into a "Turnkey Building Lease Program," only by written acceptance within 30 days after a lease proposal is made to them. *Id.* at 36. The Turnkey Option required franchisees to have a minimum of $25,000 in reserve capital after the franchise opened. *Id.* at 36. The addendum also states that all proposed sites would be reviewed by GNG and their affiliated investors and would be approved only if the site met income producing potential based on demographic requirements. *Id.* at 36. It is undisputed that GNG never complied with the Turnkey Option.

On January 11, 1988, plaintiffs John R. Doyle and John W. Doyle had entered into a similar license agreement with GNG for a fee of $25,000. *Id.* at Exh. 6, p. 1–4. This agreement authorized the Doyles to operate a Grease 'N Go franchise in Suffolk County and also had an addendum which contained the same Turnkey Option as ADM's agreement. *Id.* at 36. It is undisputed that GNG never performed the Turnkey Option in the Doyle agreement.

On December 1, 1987, James Kelly and Michael LaBianca ("K & L") also had entered into a license agreement with GNG which authorized K & L to open a Grease 'N Go in Suffolk County, and possibly Florida should the parties later agree. *Id.* at Exh. 5. K & L's license agreement did not contain the first three pages of the addendum referring to the Turnkey Option as did ADM's and the Doyles' license agreements. However, the K & L agreement did contain a sheet describing the Turnkey Building Lease Program, as did ADM's and the Doyles' license agreements. This sheet states that GNG would assist franchisees in locating "build-to-suit" developers and investors for a "Turn Key" operation. *Id.* at 37. The sheet states that GNG would assist franchisees with site

qualification, negotiation and review of all lease documents. *Id.* at 36. The sheet goes on to state that the out of pocket investment expense would be approximately $50,000–$65,000 and that qualified applicants may be able to lease equipment from a third-party leasing company. *Id.* Nevertheless, K & L alleged that GNG was obligated to provide the Turnkey Option because of a handwritten provision in their basic license agreement.[3] Pl's. Mem. Opp'n at 3.

Defendant GNGATL is owned by James Wallace Reid. In or about April 1986, R.S.Q. Associates, Inc. ("RSQ"), a Virginia based company founded by Reid, purchased from GNG one Grease 'N Go franchise for $25,000 which RSQ opened at its own expense. Reid Aff. at ¶ 4. At the same time, RSQ also paid a deposit of $48,000 for eight additional franchises. *Id.* at ¶ 4. After April 1986, RSQ proceeded to construct and open by June 1989 three more GNG oil change centers, and, subsequently, constructed and opened another three. *Id.* at ¶ 4. None of the license agreements that RSQ had signed with GNG from 1986–1988 contained a Turnkey Option. GNGATL Exh. 20.

In October 1987, Richard Lindstrom, president of GNG, asked Reid to make an "emergency loan" to GNG in the amount of $42,000. *Id.* at ¶ 5. Reid gave GNG a personal loan and was issued a promissory note and obtained a security agreement from GNG dated October 6, 1987.[4] *Id.* at ¶ 5. Reid made additional loans to GNG from October 1987 to January 1988 totalling $45,000, and these loans were similarly secured. *Id.* at ¶ 6. Later, an amended security agreement was issued granting Reid a primary security interest in franchise fees that were payable from his company, RSQ, to GNG. *Id.* at ¶ 7. Reid was also granted a second security interest entitling him to franchise fees and royalty fees that were payable to GNG from other franchises in Virginia and Maryland in

---

3. Plaintiffs K & L cite a handwritten sub-section provision, under the section "Place of Business" in their basic license agreement with GNG, which states "Licensee shall not be required to accept an initial lease in excess of $7,000.00 for first year." GNGATL Exhibit 5 at 3. This opinion will assume that K & L had a Turnkey Option with GNG.

4. Reid's affidavit makes reference to a "Document 1" which was annexed to his affidavit describing the original security agreement; however, this document was not submitted to the court.

the event that the primary security agreement was insufficient. *Id.* at ¶ 7. Subsequently, GNG defaulted on payment of the notes. *Id.* at ¶ 8. In July of 1988, GNG agreed to pay Reid $19,000 by way of royalty fees that were owed by RSQ to GNG; at that time GNG also issued Reid a new promissory note for $74,091.70, dated July 13, 1988, consolidating and replacing the five previous notes. *Id.* at ¶ 8. The note was made payable on demand and contained a security agreement. *Id.* at ¶ 9.[5] GNG later defaulted on payment of this note too, and Reid exercised his security interest and collected partial payment out of RSQ's royalty fee obligation that was to be paid to GNG; but there was still an unpaid balance of $31,832.49 as of June 1989. *Id.* at ¶ 9.

Earlier, in or about September or October 1987, Reid and Lindstrom also agreed that Reid would purchase 5,000 shares of GNG stock for $10,000 and Reid would become a Director of GNG; in return Reid was to use his "best efforts" to obtain financing for GNG. *Id.* at ¶ 10. In or about February 1988, the October 1987 agreement was abandoned because GNG refused to comply with the terms of the agreement when it failed to provide Reid with audited financial statements and future operational budgets of GNG. *Id.* at ¶ 11. Reid informed Lindstrom that he wanted to return the shares of GNG stock and that he wanted a refund of the purchase price; Lindstrom did not accept that "offer." *Id.* at ¶ 11. Reid contends that at one point he "assumed" that he was a Director of GNG and did make statements to that effect, but after he had a "falling out" with Lindstrom, he did not consent to become a Director of GNG. *Id.* at ¶ 12. In his affidavit, Reid states that he did not receive any notices that called a directors' meeting; he never attended a directors' meeting; he never received any reports or minutes of any directors' meetings (except for the minutes of a February 1, 1988 meeting that Lindstrom sent to Reid upon his request); he never attended any GNG stockholders meetings; he never received any notices for a GNG stockholders meeting; and he was never "officially" notified that he was elected as a Director of GNG. *Id.* at ¶¶ 12–15.[6] Reid also contends that the minutes of the February 1, 1988, meeting were only sent to him because GNG had increased its shares of outstanding stock from 25,000 to 50,000, and Reid, still holding 5,000 shares of GNG stock, wanted documentation citing the reasons for the additional shares of stock being issued. *Id.* at ¶ 14. Reid's inquiry was made only after he had been informed by GNG's management that they were selling GNG to a company named Auto Spa, Inc. ("ASI") and that Reid needed to sell his shares of GNG stock to ASI; however, the sale of GNG to ASI was never completed. *Id.* at ¶ 14. Reid contends that from February 1988 to May 1989, his only contacts with Lindstrom were when he attempted to obtain repayment of his loans and when he was contacted to sell his shares of stock to ASI. Other than for those purposes, Reid claims he had no conversations or knowledge of how GNG conducted its business affairs during that time. *Id.* at ¶ 15.

On May 2, 1989, Reid received a notice that a GNG stock holders meeting was going to be held on May 8, 1989, wherein a vote would be conducted for the sale of GNG to Channel One, Inc. ("CHO"). *Id.* at ¶ 16. Reid as a shareholder, creditor and franchisee of GNG, was interested in the possible sale of GNG, so he retained counsel to get more information about the proposed sale to protect his interests. *Id.* at ¶¶ 16–17.

Reid stated that until he received the notice on May 2, 1989, he had no prior knowledge of CHO or its parent corporation, 10 Minute Pit Stop U.S.A., Inc., or the transaction. *Id.* at ¶ 18.[7] Sometime in mid-May 1989, Reid was informed that the GNG stockholders approved the sale of GNG to CHO. *Id.* at ¶ 19. On May 23, 1989, Reid began to

---

5. Although it is not entirely clear from Reid's affidavit, it appears that the security agreement contained in the July 13, 1988, note was the same security agreement that was contained in the earlier notes.

6. Although discovery has been completed, plaintiffs offer no documentary, circumstantial or other evidence to dispute Reid's affidavit.

7. Here, also, plaintiffs have offered no evidence to the contrary, documentary or otherwise.

negotiate with Tom Hayes, President of CHO, for the right to take over the Grease 'N Go system in the eastern United States. *Id.* at ¶ 18. Reid then formed a new company, Grease 'N Go Atlantic, Inc. ("GNGATL"). *Id.* at ¶ 20. On June 15, 1989, GNGATL purchased by an assignment and assumption of the license agreements and the Grease 'N Go service mark and system rights for the eastern United States from CHO, for $350,000, 5,000 shares of GNG stock, and the unpaid balance of the July 13, 1988, promissory note that previously had been issued by GNG to Reid. *Id.* at ¶¶ 19–20.

On June 16, 1989, GNGATL and Grease 'N Go International ("GNGINT"), previously known as CHO, sent out a joint letter to the eastern region franchisees announcing the GNGATL purchase of Grease 'N Go. Def's. Mem. Supp. at Exh. 14. This letter stated that GNGATL would be responsible to provide franchisees with all the services and materials as stated in their existing license agreements. *Id.* The letter also stated that all franchise royalties, advertising fund contributions and remaining franchise fee balances, if any existed, were payable to GNGATL. *Id.* On June 23, 1989, GNGATL sent a letter to franchisees in the eastern region announcing that it would assume all "future" rights and management responsibilities for the Grease 'N Go System. *Id.* at Exh. 15. The letter also explained that RSQ had already built and operated four Grease 'N Go centers, and that several more centers were slated for construction and would soon be open. *Id.* GNGATL also stated that it would assist any of its franchisees with any questions that they had about the Grease 'N Go system. *Id.*

In its motion for summary judgment, GNGATL submitted an affidavit from Mr. Robert M. Goolrick, Vice President of GNGATL who negotiated the sale between GNGINT and GNGATL. *Id.* at Exh. 20. Goolrick states that GNGATL was told that the contracts it had purchased from GNGINT were all in "standard form" like the ones signed by RSQ with GNG, which, as noted, did not contain a Turnkey Option. Goolrick Aff. at ¶ 4. Indeed, Goolrick states

that GNGATL had no knowledge of any Turnkey Option until this suit was filed. *Id.* at ¶ 4. Goolrick further states that because of "tensions" between Reid and GNG, GNGATL was given little opportunity to review the "actual" franchise contracts that GNGATL purchased, but, in any event, none of the agreements that were reviewed contained an option for a Turnkey Building Lease Program. *Id.* at ¶ 5.

In or about August 1989, GNGINT transferred back to GNG all the assets it had previously acquired from it in June 1989, except for the assets that had been sold to GNGATL. Def's. Mem.Supp. at 10. GNG filed for Chapter 11 protection under the Bankruptcy Code on September 26, 1989 and GNGINT did the same sometime thereafter. *Id.* at 10; Pl's. Mem. Opp'n at 1. As a result, plaintiffs' claims against GNG and GNGINT have been stayed pursuant to 11 U.S.C. § 362.

## Discussion

In the complaint, plaintiffs' first three causes of action allege breach of contract because they were not provided facilities pursuant to the "Turnkey Building Lease Program." Plaintiffs allege as a fourth cause of action that they are entitled to rescission of their respective license agreements with GNG because they were executed illegally under New York State General Business Law. Plaintiffs allege in their fifth through seventh causes of action that GNG, GNGINT and GNGATL engaged in a series of fraudulent conveyances wherein they defrauded plaintiffs.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted when there exists no "genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Court must consider whether a reasonable finder of fact could rationally find in favor of the party opposing summary judgment; if such a finding is not possible, a court may appropriately grant summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986).

The moving party bears the burden of proving that no genuine issue of material fact

exists. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 156, 90 S.Ct. 1598, 1607, 26 L.Ed.2d 142 (1970). The movant can meet this burden by showing that no evidence exists in support of the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). If this burden is met, the burden shifts to the non-moving party to come forward with evidence of specific facts showing that there is a genuine issue of fact for trial. *Anderson, supra*, 477 U.S. at 256, 106 S.Ct. at 2514. The evidence asserted by the non-moving party cannot consist of "mere allegations or denials of the adverse party's pleading," but must set forth "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). This is especially so where the issue is one on which the non-moving party has the burden of proof. However, all of the evidence and the reasonable inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." *Adickes, supra*, 398 U.S. at 158–59, 90 S.Ct. at 1608–09. If all the requirements of the summary judgment standard are met, the court should not hesitate to grant a summary judgment motion because its principal purpose "is to isolate and dispose of factually unsupported claims." *Celotex, supra*, 477 U.S. at 323–24, 106 S.Ct. at 2552–53.

## A. Breach of Contract Claims

In the first three causes of action in the complaint, each of the plaintiffs claimed that GNGATL was liable for GNG's failure to perform under the Turnkey Option which they allege was specified in their license agreements with GNG. GNGATL claims that it only assumed liability for future obligations under the license agreement with GNGINT.[8] Def's. Mem.Supp. at 11. Moreover, GNGATL asserted that it was unaware of any Turnkey Options in the respective license agreements and if it had been aware of the options, it would certainly not have assumed them. *Id.* at 11. GNGATL's mo-

tion for summary judgment on the contract claims should be granted for the following reasons.

(1)

■ Clause 2 of the GNGATL and CHO June 15, 1989 Assignment and Assumption of the Lease Agreement provides:

> Grease N' Go (Atlantic), Inc. assumes all responsibilities for future performance of services, and *for other obligations*, required to be performed by the Licensor under the terms of the respective License Agreements. Grease N' Go (Atlantic), Inc. agrees to exercise reasonable and customary diligence in the performance as Licensor. Grease N' Go (Atlantic), Inc. does not assume, and shall not be responsible for any claim of default or breach by Licensor of the License Agreements occurring prior to the date hereof nor any claim for recession or damage in connection with the procurement or execution of the License Agreements. Assignor shall indemnify and hold harmless Grease N' Go (Atlantic), Inc., its successors, and assigns, from and against any liabilities or expense (including costs of defense and legal fees) in any claim made against Grease N' Go, (Atlantic), Inc. for such prior default, breach or performance. (Emphasis supplied.)

Plaintiffs construe the phrase "and other obligations" in the first sentence of clause 2 to mean that GNGATL assumed the obligations under the Turnkey Options, and thus defendant is responsible for CHO's breach of that obligation. Pl's. Mem. Opp'n at 8. This is because, plaintiffs contend, the obligations under the Turnkey Option were an existing and continuing promise of the Licensor. *Id.* at 8. Plaintiffs also contend that the letter dated June 16, 1989 from GNGATL to the eastern territory franchises announcing the transfer and stating that GNGATL will be responsible to provide "all services and materials which the Licensor undertakes in the License Agreement" is further evidence that

---

**8.** GNGATL also argues that neither party can determine which franchises were transferred to GNGATL because neither party can determine which schedule was supposed to be attached to the GNGATL and CHO agreement. GNGATL

Memorandum of Law at 12. GNGATL states that neither schedule contains ADM and that GNGATL did not acquire it. *Id.* at 12. For the purposes of this opinion, it is not necessary to address this issue.

GNGATL assumed the obligation under the Turnkey Options. *Id.* at 9.

It is stretching beyond reason to believe that the phrase "other obligations" refers to anything other than the standard duties of any franchisor as described in the basic franchise or license agreement. There is not one word in the CHO/GNGATL agreement alluding to the "Turnkey Option." GNGATL pointedly notes that "it would have made no sense for Atlantic to pay $350,000 for contracts and to still have to acquire land and construct centers at its own cost." *Id.* at ¶ 8. It defies common sense to believe that RSQ would have assumed such a responsibility without any description of the number of franchises which had this option, the physical status of each franchise and numerous other related financial questions.

Similarly, the June 16, 1989, letter only states that GNGATL would be responsible to provide franchisees with the "services and materials" as stated in the license agreements and that royalty and advertising fees were now to be paid to GNGATL. GNGATL Exh. 14. This letter makes no reference to the Turnkey Options or construction of a lube center by GNGATL.

But, even assuming that somehow the phrase "other obligations" could be viewed as ambiguous, the surrounding facts and circumstances establish unequivocally that GNGATL did not assume any obligations under the Turnkey Options. GNGATL submitted an affidavit from Mr. Robert M. Goolrick, Vice President of GNGATL who negotiated the sale between GNGINT and GNGATL. Def's. Mem.Supp. at Exh. 20. In his affidavit, Goolrick states that GNGATL was told that the contracts it had purchased were all in "standard form" like the ones signed by RSQ with GNG, which did not contain a Turnkey Option. Goolrick Aff. at ¶ 4. Goolrick also states that GNGATL had no knowledge of any Turnkey Option until this suit was filed. *Id.* at ¶ 4. Because of "tensions" between Reid and GNG, GNGATL was given little opportunity to review the "actual" franchise contracts that

GNGATL purchased, but in any case, none of the agreements that were reviewed contained a Turnkey Option. *Id.* at ¶ 5.

Plaintiffs' response to GNGATL's assertion that they only intended to assume standard form license agreements and Goolrick's account of what occurred is that it is "entirely unconvincing." Pl's. Mem. Opp'n at 9. To the contrary, it is hard to give plaintiffs' position any weight given the fact that discovery has already been completed, and plaintiffs have yet to offer one shred of either direct or circumstantial evidence which would justify a court or jury disbelieving Goolrick's account of what occurred. The undisputed facts that a Turnkey Option was not contained in any of RSQ's license agreements with GNG, that RSQ had constructed at least seven Grease 'N Go centers from its own funds and that RSQ never sought to avail itself of the Turnkey Building Lease Program constitutes compelling circumstantial evidence supporting Goolrick's account that GNGATL had no knowledge of any Turnkey Option. But, even if one were to ignore Goolrick's account, plaintiffs have pointed to no specific fact which would indicate that there is a genuine issue for trial. A conclusory attack on Goolrick's credibility is insufficient to defeat a motion for summary judgment on an issue as to which plaintiffs bear the burden of proof.

### (2)

■ As a matter of law, the contract imposes no liability on GNGATL in connection with the Turnkey Options. The agreement between GNGATL and CHO executed on June 15, 1989, provides that GNGATL will "not assume, and shall not be responsible for any claim of default or breach by Licensor of the License Agreements occurring prior to the date hereof. . . ." Def's. Mem.Supp. at Exh. 12. The language of the agreement is clear and unambiguous, and is only susceptible to one reasonable interpretation, i.e., that GNGATL did not assume responsibility for prior defaults under the Turnkey Options.[9]

9. It should also be noted that in the CHO/GNG agreement there is also a clause which states that CHO would not assume any responsibility for

past breaches by GNG. Def's. Mem.Supp. at Exh. 7.

A party may properly seek summary judgment on breach of contract claims when the language of the contract is unambiguous. 35B C.J.S. *Federal Civil Procedure* § 1166 (1960). In a contract dispute a motion for summary judgment may be granted only where the agreement's language is unambiguous and conveys a definite meaning. *Sayers v. Rochester Telephone Corp.*, 7 F.3d 1091, 1094 (2d Cir.1993); *Seiden Assocs. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir.1992); *Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir. 1985). When the language of the contract is clear, summary judgment is appropriate, and the fact that one party may have a different interpretation of the language does not make it any less plain. *Harris Trust and Savings Bank v. John Hancock Mutual Life Ins. Co.*, 970 F.2d 1138, 1147 (2d Cir.1992); *Investors Ins. Co. v. Dorinco Reins. Co.*, 917 F.2d 100, 104 (2d Cir.1990). The proper interpretation of a contract is a question of law for the court. *Harris Trust, supra*, 970 F.2d at 1148; *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir.1989). Contract language is ambiguous only if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Sayers, supra*, 7 F.3d at 1095 (citing *Walk–In Medical Centers, Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir.1987)). There is no ambiguity in a contract when the language has a "definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Sayers, supra*, 7 F.3d at 1095 (citing *Breed v. Insurance Co. of North America*, 46 N.Y.2d 351, 355, 385 N.E.2d 1280, 1282, 413 N.Y.S.2d 352, 355 (1978)). *Accord Seiden, supra*, 959 F.2d at 428; *Metropolitan Life Ins. Co. v. RJR Nabisco*, 906 F.2d 884, 889 (2d Cir. 1990).

In an affidavit submitted by Richard Appio, Vice President of ADM, Appio stated that he had repeated contact with Denise Dewey, Director of Franchise Operations, for GNG. Appio Aff. at ¶ 6. Appio stated that "[d]uring these calls we discussed the performance, or lack of performance by Grease 'N Go. These calls continued through October of 1988, when we began seeking the return of our franchise fee." *Id.* at ¶ 6. This statement constitutes strong evidence that ADM was claiming a breach of its agreement as early as October 1988, well before GNGATL entered into its agreement with CHO. Thus, at the time when GNGATL acquired the license agreements the obligation to perform the Turnkey Options had already been breached. In the case of plaintiffs K & L, they were asked by defendants' interrogatory # 2 to identify any acts taken to recover any monies paid for the K & L license agreement, plaintiffs replied that they "could not recall what acts were taken to recover monies paid other than commencement of this action." Pl's. Exh. B. The clear implication was that a breach had already occurred.

Although the Turnkey Options attached to plaintiffs' license agreements do not specify a date by which plaintiffs had to exercise their options, K & L entered into its alleged turnkey agreement with GNG on December 1, 1987; Doyle entered into its agreement with GNG on January 11, 1988 and ADM entered into its agreement with GNG on January 29, 1988, GNGATL, on the other hand, entered into its agreement with CHO on June 15, 1989, approximately one and one-half years after the plaintiffs' agreements were entered into with GNG. If plaintiffs did not exercise their Turnkey Options during this eighteen month period,—a highly unlikely eventuality—then their claim is barred as untimely since no demand was ever made. As is more likely the case, during this period plaintiffs sought unsuccessfully to have GNG either fulfill their commitment or return their money, then the breach predated GNGATL's agreement with CHO and under the explicit language of the agreement, GNGATL is not responsible for the past breaches.

B. *Plaintiffs' Claim that their License Agreements with GNG Violated the New York State General Business Law*

Plaintiffs' fourth cause of action alleges that they are entitled to damages and

rescission because their respective license agreements with GNG violated New York State law. Plaintiffs argue that GNG was not in compliance with New York General Business Law § 683 and § 687 and are entitled to rescission and damages under § 691. Pl's. Mem. Opp'n at 12. Plaintiffs have submitted two letters from the State of New York Department of Law as evidence that GNG had not complied with certain franchise registration requirements when their respective agreements were entered into. *Id.* at Exh. F.

GNGATL's summary judgment motion on this cause of action should be granted because plaintiffs have failed to allege a genuine issue of material fact to be tried. Under § 691(1) civil remedies are only available against a "person who offers or sells a franchise in violation" of § 683, § 684 or § 687. Under § 691(3) civil remedies are only available against a person who "directly or indirectly controls a person liable under this article...." In the present matter, GNG, not GNGATL, sold the franchises. Moreover, GNGATL could not have controlled GNG when plaintiffs bought their franchises, because GNGATL was not even existence at the time. Thus, GNGATL cannot be held liable under § 691. Moreover, it is clear from the language of the GNGATL and CHO agreement executed on June 15, 1989, that GNGATL did not assume liability for any claims of rescission or damages as a result of the execution or procurement of the license agreements issued by GNG. Accordingly, GNGATL's motion for summary judgment on plaintiffs' fourth cause of action is granted.

## C. *Plaintiffs' Fraudulent Conveyance Claims*

In their fifth through seventh causes of action plaintiffs allege that they were harmed by a series of fraudulent conveyances between or among GNG, GNGINT, and GNGATL. To say that the pleading is confusing is an understatement. It is not altogether clear whether the complaint is alleging a cause of action for fraud or a violation of New York State Debtor and Creditor Law ("DCL"), but a close reading makes it appear that—whatever their legal theory is—all three causes of action against defendant GNGATL rest on two propositions:

First, GNGATL was a party to or had knowledge of a scheme to divest GNG of its assets; the negotiations and conveyances between GNGINT and GNGATL were part of this scheme; and GNGATL acted with the intent to "hinder, delay or defraud either present or future creditors" of GNG and GNGINT, including the plaintiffs. Compl. ¶ 46. Alternatively, even if GNGATL was not a party to the scheme, GNGATL had actual or constructive notice of it.

Second, the transaction between GNGINT and GNGATL was made for less than fair consideration.

Discovery has been completed, and it is clear that plaintiffs have presented insufficient evidence to create a trial issue for either proposition. In addition, the plaintiffs lack standing to bring these claims and their claims are barred as a matter of law.

### (1)

■ Turning first to plaintiffs' claim that GNGATL was either a party to a scheme to defraud GNG's creditors by stripping it of its assets or had actual or constructive notice that these transactions were fraudulent, GNGATL asserts convincingly that neither it, Reid nor Goolrick had any interest in CHO (later GNGINT). Plaintiffs have offered no evidence to contradict this lack of commonality of ownership.

Nevertheless, plaintiffs attempt to create an issue of fact by asserting that Reid's statements that the GNGINT/GNGATL transaction was conducted at arms length and that he had no knowledge of GNG's business dealings between February 1988 and June 1989 are contradicted by "statements" contained in his affidavit. Pl's. Mem. Opp'n at 20. Plaintiffs point to statements in Reid's affidavit in which Reid admits that he was provided with the minutes of the February 1988 directors' meeting, participated in an August 1988 meeting with a GNG officer, knew GNG assets were being sold and was sent a copy of the GNG/CHO (GNGINT) agreement. *Id.* at 20. However, Reid's affidavit states that he was notified of the pro-

posed, but ultimately unsuccessful, sale of GNG to ASI in early 1988, and this occurred only because, as a stockholder, he was curious why GNG increased its shares of outstanding stock. As a result of his inquiry, he was provided with the minutes from a February 1988 directors' meeting and participated in an August 1988 meeting, again only because GNG requested that he sell his shares of stock. Reid Aff. at ¶¶ 12–15. Plaintiffs have submitted no evidence that Reid's statements are in any way inaccurate.

Plaintiffs also rely on an October 1, 1987, letter from Reid to GNG franchisees announcing that he had been appointed to GNG's board of directors, that the Wallace Group, a company owned by Reid, had purchased a 10% interest in GNG, that Wallace Securities Corporation would underwrite GNG and finance several of its projects, and that Goolrick had been appointed a Director of GNG. Pl's. Mem. Opp'n at 18. At an examination before trial, Reid stated that none of the things stated in the October 1, 1987, letter were ever done because GNG's officers were "less that truthful" to him. *Id.* at Exh. I, p. 13–14. Again, plaintiffs have submitted no evidence to contradict this assertion and, in particular, to show that Reid ever attended a GNG directors' meeting. Plaintiffs' only response is to assert that the franchisees were never notified of the failure of these agreements to be executed. Presumably, from this thin reed, a jury could infer that GNGATL was a party to GNG's fraud. *Id.* at 19.

Plaintiffs next assert that Reid was aware of GNG's financial distress, that GNG could not meet its financial obligations and the details of the conveyance to CHO. *Id.* at 20. To support the claim that Reid knew that GNG was in "financial distress," plaintiffs point to the fact that in October 1987, he loaned them money to meet payroll expenses. But it is hard to believe that Reid would have loaned GNG money if he thought it was on the verge of bankruptcy. Also, plaintiffs claim that at an examination before trial, Reid stated that at some point he was aware that GNG was bankrupt or going into bankruptcy and trying to "sell off" the company. *Id.* at 19. However, his affidavit is not clear

at what point in time he obtained this knowledge, see *id.* at Exh. I, p. 20, and the point was not pursued.

At this point plaintiffs' conjectures, while appropriate at the beginning of this lawsuit, are insufficient to withstand a motion for summary judgment after discovery has concluded and on an issue on which plaintiffs bear the burden of proof. Plaintiffs have failed to offer any substantial evidence that GNGATL or anyone associated with it had actual knowledge of GNG's machinations, let alone that the GNGINT/GNGATL transaction was part of a scheme to strip GNG of its assets or its creditors. Moreover, when fair consideration has been paid, constructive knowledge alone is not sufficient for a fraud claim or any claim under New York's Debtor and Creditor Law and, even if it were, plaintiffs have not shown that GNGATL should have been aware of GNG's desperate financial condition. Plaintiffs have failed to raise a triable issue that GNGATL participated or had knowledge of GNG's fraudulent scheme.

(2)

■ Plaintiffs' second claim is that the transactions between GNGINT and GNGATL were made for less than fair consideration and presumably violated DCL §§ 273 and 274. In support of this claim, plaintiffs argue that despite the fact that GNGATL was unable to determine the precise number of franchise rights that were transferred to it, taking its "shortest list" which it could verify—113—the consideration for these franchises should have been approximately $2.825 million—far less than the consideration paid by GNGATL to GNGINT. *Id.* at 16. Here, too, plaintiffs' evidence is insufficient to create a material issue of fact that GNGATL did not give fair consideration.

New York State DCL § 272 defines fair consideration as given for property, or an obligation:

a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not

disproportionately small as compared with the value of the property, or obligation obtained.

In the transaction in question, GNGATL paid GNGINT $350,000, gave it 5,000 shares of GNG stock and released the remaining balance of the GNG note that was owed to Reid in return for the franchise rights in the eastern United States. Under the plain language of § 272, plaintiffs have submitted no evidence that GNGATL did not give fair consideration for these franchise rights. The burden of proving both insolvency of GNG and the lack of fair consideration is upon the party challenging the conveyance, and the determination of insolvency or what constitutes fair consideration is generally one of fact to be determined under the circumstances of the particular case. *American Investment Bank, N.A. v. Marine Midland Bank, N.A.,* 191 A.D.2d 690, 691, 595 N.Y.S.2d 537, 538 (2d Dep't 1993).

On the issue of no fair consideration, plaintiffs' yardstick for measuring what would be fair consideration is completely inappropriate because the initial franchise fee of $25,000 was paid to GNG from the franchisees, all GNGATL purchased was the right to royalty fees.[10] There is no claim that GNGATL received any of the $25,000 franchise fee monies. Thus, plaintiffs would apply a completely unrealistic standard to determine what should constitute fair consideration in the GNGATL/GNGINT transaction. There is also no showing that the future franchise fees were worth more than GNGATL paid. Moreover, in light of the fact that GNGATL paid $350,000, gave up 5,000 of GNG stock and discharged the balance of the notes that GNG still owed to it, it appears that GNGATL at best made a bad investment and at worst was a victim of a fraudulent scheme, as were the plaintiffs.

■ Plaintiffs also allege that GNGATL entered into the transaction with GNGINT with bad faith and had notice that the transaction would leave GNGINT insolvent. When a transferee has given equivalent value in exchange for the debtors property the statutory requirement of good faith is satisfied if the transferee acted without either actual or constructive knowledge of any fraudulent scheme. *HBE Leasing Corp. v. Frank,* 48 F.3d 623, 636 (2d Cir.1995). As noted earlier, plaintiffs submit no credible evidence to refute GNGATL's claim that it did not know any members of GNGINT prior to the sale or that it had knowledge, constructive or actual, that this transaction would render GNGINT insolvent. Plaintiffs only submit evidence that GNGATL had some involvement with members of GNG, but offer no evidence that GNGATL had any knowledge of GNGINT's financial situation. If anything, the $350,000 and 5,000 shares of GNG stock that GNGINT received left them in a better position to satisfy their debts. At most, Reid knew that GNG was having financial difficulties, but this is not evidence that GNGATL knew GNGINT was insolvent or that its transaction with GNGINT had rendered it insolvent. Indeed, GNGINT's bankruptcy petition was filed several years after the transaction.

Plaintiffs' evidence is insufficient to create a material issue of fact that GNGATL did not give fair consideration.

(3)

■ Nevertheless, assuming that all of the plaintiffs' contentions raise factual issues for a jury, plaintiffs' claims are still barred as they have no standing to bring these claims as a matter of law. GNG and GNGINT are in bankruptcy. If there is any merit to any of plaintiffs' fraudulent conveyance claims against GNGATL, the claims belong to the trustees of these two bankrupt corporations unless plaintiffs have been properly authorized by the bankruptcy court to bring these claims. *See In re Chemical Separations Corp.,* 32 B.R. 816, 819 (Bankr.E.D.Tenn. 1983); *Matter of Joyanna Holitogs, Inc.,* 21 B.R. 323, 325 (Bankr.S.D.N.Y.1982); *Liberal Market, Inc. v. Malone & Hyde, Inc.,* 14 B.R. 685, 689–90 (Bankr.S.D.Ohio 1981); *In re Monsour Medical Center,* 5 B.R. 715, 717 (Bankr.W.D.Penn.1980). Plaintiffs have made no such allegation or offered any proof

---

**10.** The basic license agreements executed by ADM, Doyle and K & L all required them to pay a 5% royalty fee out of each months gross receipts and 8% of the previous months gross receipts which was to be used only for advertising and promotion, to the franchisor.

to that effect. Moreover, under New York law, to recover under the DCL and attack a transaction as being fraudulent, plaintiffs must first establish that they occupy the status of creditor. 30 N.Y.Jur.2d *Creditor's Rights and Remedies* § 338 (1983). Plaintiffs have put forth no evidence to establish that they are entitled, by assignment or any other document, to bring this action and obtain preference over any other creditor of GNG or GNGINT.

Accordingly, defendant GNGATL's motion for summary judgment on the fifth through seventh causes of action is granted as well.

### Conclusion

For the reasons set forth above, Grease 'N Go Atlantic, Inc.'s motion for summary judgment is granted on all claims. Inasmuch as defendants Grease 'N Go, Inc. and Grease 'N Go International, Inc., a/k/a Channel One, Inc., have filed for bankruptcy, and the individual defendants have either filed for bankruptcy, have never been served and/or are not locatable, it is hereby

ORDERED that, pursuant to Rule 54(b) of the Fed.R.Civ.P., there is no just reason for delay, and the Clerk is directed to enter judgment in favor of Grease 'N Go Atlantic, Inc., against all plaintiffs; and it is further

ORDERED that the action is administratively closed pending the disposition of the aforementioned bankruptcy petitions.

SO ORDERED.